**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MCKESSON CORPORATION,**<br><br>Plaintiff & Counter-Defendant,<br><br>*v.*<br><br>**PAIN MANAGEMENT COMPANY LLC and BRIAN DUNLEAVY,**<br><br>Defendants & Counter-Plaintiffs. | **CIVIL ACTION**<br><br>**NO. 26-285-KSM** |

**MEMORANDUM**

**Marston, J.** **September 2, 2026**

Motions to dismiss must take a plaintiff's allegations as they are, not how they would like them to be. Here, McKesson Corporation ("McKesson") has done that, but only in part; so, we will rule similarly on its Motion to Dismiss. McKesson has filed suit for breach of contract and unjust enrichment against Pain Management Company LLC and its owner Brian Dunleavy (collectively, "PMC") due to PMC's alleged failure to pay for pharmaceutical products purchased on credit. (*See* Doc. No. 1 at 1.) PMC answered and asserted three counterclaims for breach of contract (Count I), breach of the implied warranty of good faith and fair dealing (Count II), and tortious interference with contract (Count III). (*See* Doc. No. 14.) McKesson has moved to dismiss each of these counts. For the reasons discussed below, we will grant McKesson's Motion to Dismiss for Count II but deny it as to Counts I and III. Though, PMC will be given leave to amend Count II, if it can do so ***in good faith***.

## I. FACTUAL BACKGROUND

Taking the allegations in PMC's Answer and Counterclaims (Doc. No. 14) as true,[1] the relevant facts are as follows:

PMC is a pharmacy that almost exclusively supplies controlled substances and medications to patients suffering from chronic pain. (*See id.* at ¶ 86.) On February 27, 2023, PMC entered into the "Pathway Enhancement Addendum" (hereinafter, "the Addendum") with McKesson, a pharmaceuticals distributor. (*See id.* at ¶¶ 78, 81.) The Addendum "permits the sale of controlled substances and other medications from [McKesson] to . . . PMC," which PMC would then use to fulfill its patient's subscriptions. (*Id.* at ¶¶ 83–84.) The Court will first discuss the parties' business relationship under and the eventual termination of the Addendum, before discussing PMC's allegations relating to the Mallinckrodt List, a list of pharmacies that the pharmaceutical manufacturer Mallinckrodt will not do business with.

### *A. Allocation Changes*

PMC alleges that roughly a year and a half after signing the Addendum, favorable market conditions drove a surge in patient demand for PMC's services, expanding PMC's customer base between August 2024 and September 2025. (*See id.* at ¶¶ 85–87.) As a result, PMC requested increased quantities of the controlled substances, which had to be "Allocated" by McKesson to PMC. (*See id.* at ¶ 89.) Allocation is a "a limiting mechanism used by medication wholesalers and distributors to prevent hoarding of medications at pharmacies; ensure that medication supplies are dispensed to pharmacies at an amount appropriate to regional need; to prevent abuse of medications allowing for too high of a quantity in circulation." (*Id.* at ¶ 90.) When assessing

[1] "The District Court, in deciding a motion under Federal Rule of Civil Procedure 12(b)(6), [i]s required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

whether to Allocate, companies perform due diligence assessments to ensure that the increase request is not rooted in a "nefarious" purpose. (*Id.* at ¶ 94.)

McKesson, after performing these due diligence assessments on PMC's Allocation requests, granted PMC's first application for Allocation in March 2025, but ultimately denied PMC's second application in August 2025. (*See id.* at ¶¶ 97, 116.) Part of McKesson's justification for rejecting the second Allocation request was concerns regarding a specific physician and the prescriptions they were ordering for a patient. (*See id.* at ¶ 111.) PMC was the pharmacy that filled that patient's medications. (*See id.* at ¶ 107.) After the denial of PMC's second Allocation request, McKesson suspended PMC from its distribution chain but gave "no substantiated rationale" for the decision. (*See id.* at ¶ 118.)

### ***B. Termination of Addendum and Aftereffects***

PMC alleges that McKesson violated Section 4[2] of the Pathway Enhancement Addendum through this suspension. (*See id.* at ¶ 137.) Specifically, because McKesson chose to terminate

[2] The relevant portion of Section 4 of the Pathway Enhancement Addendum reads:

> Member [PMC] or Distributor [McKesson] may effect an early termination of this Addendum only in the following circumstances . . . "Member or Distributor may effect an early termination of this Addendum upon the occurrence of a material, as determined in good faith by the non-breaching Party, breach by the other Party. The non-breaching Party must give written notice to the breaching Party of the occurrence of such breach. The notice must describe in detail the nature of the breach. The breaching Party will have the opportunity to cure its breach to the reasonable satisfaction of the non-breaching Party during a sixty (60) day period beginning on the date the breaching Party receives the written notice (the "Cure Period"). In the alternative, if such breach is of a nature that it cannot be cured in sixty (60) days, the breaching Party must commence and diligently prosecute in good faith the cure of such breach within the Cure Period and cure such breach within ninety (90) days. If the breach is not cured by the expiration of the Cure Period, or the breaching Party does not cure the breach within ninety (90) days under the circumstances permitted in the foregoing sentence, then the non-breaching Party may provide

the agreement, they failed to abide by the Section 4(a) requirements to: (1) "supply [PMC] with a first written notice"; (2) detail "in writing, alleged matters of [PMC's] breach"; (3) "allow [PMC] a 60-day period to cure any alleged breaches"; (4) furnish "[PMC] with a second written notice"; and (5) "provide [PMC] with a 30-day period, for which at the end of that period, the Addendum would be deemed terminated." (*Id.* at ¶¶ 141–145.) Instead, via telephone, Plaintiffs unilaterally terminated the agreement on August 4, 2025. (*See id.* at ¶¶ 147–148.)

As a result of the termination of the Addendum, PMC's "stock of controlled substances . . . ran dry and PMC could no longer satisfy fulfilling controlled prescriptions at all." (*Id.* at ¶ 151.) This caused PMC to lose patients to other pharmacies and hurt PMC's relationships with prescribing physicians. (*See id.* at ¶¶ 152–157.) Further, because PMC's relationships with other medication wholesalers, such as Real Value RX and Health Mart Atlas, were interconnected with its business relationship with McKesson, McKesson's termination had a cascading effect on those third-party business relationships. (*Id.* at ¶¶ 165–176.) McKesson was aware of these agreements and PMC's engagements with these third-party wholesalers when it decided to terminate the Addendum. (*Id.* at ¶¶ 168–69.)

Additionally, an on-site investigation of PMC by the Pennsylvania Attorney General was triggered by a complaint McKesson filed in or around August 2025 with the Pennsylvania State Board. (*See id.* at ¶¶ 158–159.) Though no prosecution was eventually pursued, McKesson's complaint stayed on PMC's record, and "harmed its business reputation with future wholesalers." (*Id.* at ¶¶ 161, 163.)

---

> written notice to the breaching Party that this Addendum will be terminated in thirty (30) days following such notice.

(Doc. No. 14 at ¶ 138.)

### *C. The Mallinckrodt List*

PMC also alleges that McKesson harmed them through the Mallinckrodt List. Mallinckrodt is a manufacturer of controlled substances, which maintains the Mallinckrodt List. (*See id.* at ¶¶ 120–121.) The Mallinckrodt List is "a database of pharmacies and other companies which it will not transact with." (*Id.*) When a medication distributor or wholesaler wants to signal to their general industry that a pharmacy may be abusing controlled substances, they can add a pharmacy to that list. (*See id.* at ¶ 122.)

PMC alleges that on or around August 26, 2025, McKesson added PMC to the Mallinckrodt List. (*See id.* at ¶ 119.) McKesson added PMC to the list under the "problematic metric issues," which is an indicator that suggests the pharmacy has been "dispensing far more potentially addictive controlled substances than typical non-controlled medications." (*Id.* at ¶ 130.) When a pharmacy like PMC is added to the list, "no medication wholesaler will take the further risk of doing business with [that] pharmacy." (*Id.* at ¶ 123.) For example, Smith Drug Company, another wholesaler, denied PMC a contract for controlled substances because PMC was on the Mallinckrodt List. (*See id.* at ¶ 131.) Subsequently, PMC was forced to close, as it was "unable to contract with any further controlled substance wholesalers." (*Id.* at ¶ 133.)

## II. PROCEDURAL HISTORY

On January 16, 2026, McKesson filed a Complaint against Brian Dunleavy and PMC in the Eastern District of Pennsylvania. (*See* Doc. No. 1.) On March 23, 2026, PMC filed its Answer and Counterclaims. (*See* Doc. No. 14.) In response to PMC's Counterclaims, on April 13, 2026, McKesson filed a Motion to Dismiss for Failure to State a Claim. (*See* Doc. No. 20.) Then, on May 11, 2026, Dunleavy and PMC issued a Response to McKesson's Motion to Dismiss. (*See* Doc. No. 25.) Finally, on May 12, 2026, McKesson filed a Reply to PMC's Response. (*See* Doc. No. 27.) As the motion is fully briefed, it is ripe for resolution.

## III. LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Accordingly, a complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Twombly*, 550 at 555. And a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009). Although the Court must accept as true the allegations in the complaint and all reasonable inferences therefrom, *Phillips*, 515 F.3d at 228, the Court is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (internal quotation omitted); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (cleaned up)).

## IV. DISCUSSION

McKesson argues that PMC has failed to state a claim upon which relief can be granted, and requests that the Court dismiss all three of PMC's counterclaims for (1) breach of contract, (2) breach of the implied warranty of good faith and fair dealing, and (3) tortious interference

with contract. (*See* Doc. No. 20.) We disagree with McKesson on their first and third arguments, but agree on the second. We address each in turn below.

### *A. Breach of Contract*

First, PMC has adequately pleaded breach of contract under Delaware law.[3] PMC asserts that McKesson breached Section 4 of the Addendum, the termination section, "which is the controlling agreement between [McKesson] and PMC." (Doc. No 14 at ¶¶ 179–180.) As a result of the Addendum termination, "PMC suffered grave, devastating, and total damages, such that it effectively no longer exists." (*Id.* at ¶ 186.) McKesson disagrees and argues that "Section 12[4] of the Addendum permits McKesson to terminate the Addendum if it suspects PMC's noncompliance with controlled substances laws or regulations," and accordingly, based on PMC's own pleadings, it is clear that McKesson did believe that "continuing to supply controlled substances [to PMC] would put McKesson in jeopardy of violating the law." (Doc. No. 20-2 at 5–6.) McKesson also notes that the language in Section 12 renders Section 4 inapplicable. (*See id.* at 8–9.) In PMC's Response to McKesson's Motion to Dismiss, PMC explains that "the entirety of [McKesson]'s argument that it did not breach the Addendum is moot because

[3] The Addendum contains a choice of law provision that states it "shall be construed in accordance with the law of the State of Delaware without regard to the rules regarding conflict of laws." (Doc. No. 15 at 9.) Federal courts sitting in diversity must apply the choice of law principles of the forum state, in this case Pennsylvania. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "Under Pennsylvania law, 'choice of law provisions of a contract will be given effect.'" *U.S. Claims, Inc. v. Yehuda Smolar, PC*, 602 F. Supp. 2d 590, 597 (E.D. Pa. 2009) (quoting *Miller v. Allstate Ins. Co.,* 763 A.2d 401, 403 (Pa. Super. 2000)). So, we will apply Delaware law to this dispute.

[4] Section 12(a) states, "**Distributor's Compliance with Laws.** Nothing in this Addendum shall be construed as requiring [McKesson] to perform any obligations hereunder or engage in any action or omission that [McKesson] reasonably determines to violate, or to put [McKesson] in jeopardy of violating any applicable law . . . ." (Doc. No. 20-2 at 5 (emphasis in original).) And Section 12(a)(2) & (2)(i), in relevant part, states that McKesson may "[i]mmediately terminate this Addendum, in whole or in part, without liability if, in [McKesson's] reasonable discretion . . . [c]ontinued performance of any part of this Addendum would . . . put [McKesson] in jeopardy of violating any federal, state or local law, rule or regulation regarding Controlled Substances or any other regulated products or activities." (*Id.*)

[McKesson] singularly rests on a fictional lynchpin of foreign evidence it seeks to introduce at this early stage, which is not available to it." (Doc. No. 25 at 5.)

PMC is correct. In pleading a claim for breach of contract under Delaware law, PMC must show "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to [PMC]." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). As to the first element, McKesson does not dispute that it has a contractual relationship with PMC per the Pathway Enhancement Addendum, and in fact relies on that contract for its counterargument regarding the applicability of Section 12. (*See generally* Doc. No. 20.) Next, PMC reasonably alleges that McKesson breached that contract by failing to follow the required steps laid out in Section 4(a) of the Addendum, the "Termination" Section of the agreement, and thus breached the contract. (*See, e.g.,* Doc. No. 14 at ¶ 180.) Finally, PMC states that it suffered damages by losing "its supply of controlled substances it was purchasing from Plaintiff" and from other future suppliers, "running negative operating balances," "wind[ing] up its affairs and clos[ing]," and losing the "entirety of PMC's good will in the local pharmacological community, with its patients, and with its prescribing physicians." (*Id.* at ¶ 182–186.)

McKesson's core argument is that Section 12 of the Addendum renders Section 4 inapplicable in light of the factual circumstances of this dispute. (*See* Doc. No. 20-2 at 9–13.) But as McKesson's motion implicitly recognizes (*see id.* at 6 n.2), we are currently at the motion to dismiss stage, not summary judgment or trial. In assessing PMC's pleading at this early stage, and making all reasonable inferences in favor of PMC, the Court finds PMC has plausibly alleged that Section 4 of the Addendum was breached. (*See* Doc. No. 14.) Nowhere in PMC's counterclaims do they state that McKesson terminated the agreement pursuant to Section 12, nor

are there allegations *in the Counterclaims* about any purportedly reasonable determination by McKesson of criminal activity. To be sure, a day may come when evidence supporting McKesson's termination under Section 12 is brought before this Court, but it is not this day. Thus, "'[c]onfronted with conflicting yet reasonable constructions of an ambiguous [a]greement,' the Court must deny [McKesson]'s Motion to Dismiss . . . with respect to [PMC]'s breach of contract claim." *Delavau, LLC v. J.M. Huber Corp.*, No. 17cv4005, 2017 WL 6525780, at *4 (E.D. Pa. Dec. 21, 2017) (quoting *Markow v. Synageva Biopharma Corp.*, No. 06cv152, 2016 WL 1613419, at *6 (Del. Super. Ct. Mar. 3, 2016)).

### *B. Breach of Implied Covenant of Good Faith and Fair Dealing*

Next, PMC asserts that when McKesson terminated the Addendum, it breached "the implied covenant of good faith and fair dealing," by "fully ignoring the early termination procedure prescribed in Section 4(a) of the Addendum." (Doc. No. 14 at ¶¶ 189, 192.) McKesson argues that PMC's counterclaim fails to "allege a specific implied contractual obligation," and that PMC seeks to improperly double dip on breach of contract by claiming that "McKesson breached the implied covenant of good faith and fair dealing by breaching an express contract provision." (Doc. No. 20-2 at 13–14 (citing *Baldwin v. New Wood Res. LLC,* 283 A.3d 1099, 1117–18 (Del. 2022) (cleaned up).) The Court agrees with McKesson and will grant its Motion to Dismiss as to Count II.

The parties agree that "[t]o sufficiently plead a breach of the implied covenant of good faith and fair dealing, a complaint must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1117–18 (Del. 2022). But [t]he implied covenant cannot be invoked to override the express terms of the contract" and it must be "used conservatively to 'ensure the parties' 'reasonable expectations are fulfilled.'" *Kuroda v. SPJS Holdings, L.L.C.*,

971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)). "Moreover, because the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, No. 3017-cv-CC, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008) (emphasis in original). By contrast, Count II only pleads that McKesson violated the explicit language of Section 4. (Doc. No. 14 at ¶ 192 ("When Plaintiff illegally terminated the Addendum, it did so arbitrarily by devising its own early termination procedure, and fully ignoring the early termination procedure prescribed in Section 4(a) of the Addendum.").) Nowhere in its pleading does PMC point to an implied term that McKesson violated, nor any facts that would support that any such term was believed to be included in the fruits of PMC's bargain. *See Dunlap*, 878 A.2d at 442 ("the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.") (cleaned up).

In sum, PMC has failed to plead sufficient facts to state a claim for breach of the implied covenant of good faith and fair dealing because of this failure to identify such an *implied* term. Even PMC's Opposition to the Motion to Dismiss appears to recognize that fact, as it argues—for the first time—that it pleaded Count II in the alternative to Count I. (*See* Doc. No. 25 at 12 ("Defendants pled Count II in the alternative to Count I's Breach of Contract, and should Defendants not be meritorious on Count I, Count II is pled in the alternative.").) But as McKesson's Reply properly points out, the alternative pleading PMC relies upon is "not stated in the Counterclaims." (Doc. No. 27 at 3.) And even if it was, PMC's alternative pleading argument only emphasizes that the claim for breach of the implied covenant of good faith and

fair dealing is—as presently pleaded—subsumed by PMC's claim for breach of contract in Count I. So, the Court will grant McKesson's Motion to Dismiss Count II, but will give PMC the chance to amend its claim if it can ***in good faith*** cure the deficiencies identified in this Memorandum.

### *C. Tortious Interference with a Contract*

Finally, PMC asserts that McKesson knew about and tortiously interfered with PMC's contract with Health Mart Atlas, which is PMC's Pharmacy Services Administrative Organization ("PSAO"). (*See* Doc. No. 14 at ¶ 199.) According to PMC, that contract was only effective if PMC was participating as a "McKesson-serviced pharmacy" because of the requirements detailed in the Health Mart Atlas Contract. (*Id.* at ¶ 201.) Thus, when McKesson terminated the Addendum, it knew it would and, did in fact, directly cause the termination of the Health Mart Atlas Contract. (*See id.* at ¶ 204.) In its Motion to Dismiss, McKesson counters that "PMC's demand is explicitly barred by Article 11 of PMC's contract with Health Mart Atlas,[5]" namely that "Article 11 limits PMC's 'sole and exclusive remedy' against an affiliate of

---

[5] Article 11 of PMC's contract with Health Mart Atlas states in full:

> PHARMACY [PMC] ACKNOWLEDGES AND AGREES THAT IN NO EVENT SHALL HEALTH MART ATLAS, ITS OWNERS, ITS OWNERS' PARENTS, AND THE AFFILIATES AND SUBSIDIARIES OF ITS OWNERS AND ITS OWNERS' PARENTS, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, SUBCONTRACTORS OR REPRESENTATIVES, BE LIABLE TO PHARMACY FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, LOSS OF PROFITS, OR LOSS OF GOODWILL, EVEN IF HEALTH MART ATLAS HAS BEEN NOTIFIED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING. PHARMACY AGREES THAT THE SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PHARMACY SHALL BE LIMITED TO THE RECOVERY OF ACTUAL DIRECT DAMAGES NOT IN EXCESS OF THE TOTAL MEMBER FEES ACTUALLY PAID TO HEALTH MART ATLAS, REDUCED BY ANY AMOUNTS PAID, CREDITED OR REFUNDED TO PHARMACY BY HEALTH MART ATLAS, PLUS ANY CENTRAL PAY REIMBURSEMENT ALLOCABLE TO PHARMACY THAT HAS BEEN RECEIVED BY

Health Mart Atlas (including McKesson) to direct damages." (Doc. No. 20-2 at 15–16). And McKesson argues that under Delaware law, an interference with a claim for tortious interference must show interference that is malicious or in bad faith, and PMC has failed to do either. (*See id.*) PMC, in their Reply to McKesson's Response, argues that it clearly pleaded the necessary facts in the "127 Paragraphs of the Counterclaims, which contain factual averments informing the Court of the steps [McKesson] took – purposefully, willingly, maliciously – to blacklist [PMC] from the pharmaceutical industry." (Doc. No. 25 at 13.)

To state a claim for intentional interference with contractual relations, PMC must allege that there was "(1) a contract, (2) about which [McKesson] knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013). Despite McKesson's arguments otherwise, the Court agrees that, at this stage, PMC has pleaded enough facts to survive a motion to dismiss.

First, McKesson does not dispute that there was a contractual relationship between PMC and Health Mart Atlas. (Doc. No. 20-2 at 15 ("PMC's demand is explicitly barred by Article 11 of *PMC's contract with Health Mart Atlas*" (emphasis added).) Second, PMC, in its pleadings, states that McKesson took the necessary purposeful action by terminating the Addendum, with the knowledge that it would result in the termination of the agreement between Health Mart

---

> HEALTH MART ATLAS BUT NOT DISBURSED TO PHARMACY. THE PARTIES AGREE THAT THIS LIMITATION OF LIABILITY SHALL SURVIVE AND CONTINUE IN FULL FORCE AND EFFECT DESPITE ANY FAILURE OF AN EXCLUSIVE REMEDY. SUCH LIMITATION OF LIABILITY SHALL SURVIVE EXPIRATION OR TERMINATION OF THIS AGREEMENT.

(Doc. No. 20-2 at 15.)

Atlas and PMC. (Doc. No. 14 at ¶¶ 204–205.) Third, as described throughout PMC's Counterclaims, McKesson terminated that Addendum purportedly without justification, as they failed to follow the termination procedures laid out in Section 4. (*See generally id.*) Finally, PMC experienced damages as a result of the termination of the Health Mart Atlas contract, such as losing "access to patient networks, certain reimbursement programs for sales, and other unique benefits." (Doc. No. 14 at ¶ 202.) McKesson's two arguments to the contrary fail at the threshold. Each argument is premised on the argument that PMC has pleaded McKesson as an "affiliate" of Health Mart Atlas (*see* Doc. No. 20-2 at 15–17), but this mischaracterizes PMC's pleading (*see generally* Doc. Nos. 14–15). Not only does the word affiliate not even appear in the Counterclaims, an "[a]ffiliate refers to a corporation that is related to another corporation by shareholdings or other means of control." *Delaware Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077 (Del. 2006) (cleaned up). PMC explicitly has pleaded that Health Mart Atlas is "a legally separate business entity from [McKesson], but which serves [McKesson] as its [PSAO]." (Doc. No. 14 at ¶ 170.) It may be so that later on in this action evidence is put forth that makes clear under Delaware law that Health Mart Atlas is an affiliate, but at this stage, the Court must take all factual allegations in the Counterclaims as true. So, the Court will deny McKesson's Motion to Dismiss as to Count III.

## V. CONCLUSION

For the reasons set forth above, McKesson's Motion to Dismiss is denied as to Count I and III and is granted as to Count II. An appropriate order follows.